1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**United States District Court**
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

IN RE: ONLINE DVD RENTAL
ANTITRUST LITIGATION
_____/

This Document Relates to:

Pierson v. Walmart.com USA LLC, et al.
(C 09-2163 PJH)
Levy, et al. v. Walmart.com USA LLC, et al.
(C 09-2296 PJH)
_____/

No. M 09-2029 PJH

**ORDER GRANTING MOTION
TO DISMISS**

        Defendants' motion to dismiss for lack of antitrust standing came on for hearing on

September 2, 2009 before this court.  Plaintiffs, individuals representing a putative class

comprised of subscribers to the online DVD rental service of Blockbuster, Inc.

("Blockbuster"), appeared through their class counsel, Robert G. Abrams, Eugene A.

Spector, Paul Alexander, Peter Barile, Guido Saveri, and Thomas Isaacson.  Defendant

Netflix, Inc. ("Netflix") appeared through its counsel, Jonathan M. Jacobson, and Sarah

Walsh.  Defendants Walmart.com USA LLC ("Walmart.com") and Wal-Mart Stores, Inc.

("Wal-Mart Stores")(collectively "Wal-Mart") appeared through their counsel, Genevieve

Vos.  Having read all the papers submitted and carefully considered the relevant legal

authority, the court hereby GRANTS defendants' motion to dismiss, for the reasons stated

at the hearing, and as follows.

**BACKGROUND**

        Defendants' motion arises within the context of a larger multidistrict litigation

("MDL"), but its reach is limited to two of the cases forming a part of that MDL.  Plaintiffs in

both actions represent a putative class of persons and entities who subscribed to

Blockbuster's online DVD rental service, "Blockbuster Online," during the relevant time

United States District Court

For the Northern District of California

1   period beginning August 19, 2005.  See Blockbuster Subscribers' Consolidated Amended

2   Class Action Complaint ("Consolidated Complaint"), ¶ 1.  Plaintiffs generally allege that, as

3   a result of an unlawful market allocation agreement (the "Agreement") entered into by

4   defendants Netflix and Wal-Mart on May 19, 2005, Blockbuster charged plaintiffs

5   supracompetitive subscription prices.  See generally Consolidated Complaint.

6        More specifically, plaintiffs allege that in early 2005 – during the time frame

7   preceding the relevant period alleged in the complaint – there were three direct competitors

8   in the online DVD rental market: Netflix, Wal-Mart, and Blockbuster.  Wal-Mart's service

9   was relatively new, having commenced in 2003, and Blockbuster had just entered the

10  online DVD rental market in late 2004.  Consolidated Complaint, ¶¶ 4, 45-46, 54.  Upon

11  Blockbuster's entrance into the market, and from late 2004 into 2005, plaintiff alleges that

12  increased competition in the three firm market led to price wars, as each market player

13  sought a competitive advantage.  Id. at ¶¶ 47-52, 56.

14       In January 2005, faced with this increasing competition, plaintiffs allege that Reed

15  Hastings, the chairman and CEO of Netflix, called John Fleming, the then CEO of

16  Walmart.com, and "invited him to dinner to discuss their companies' (then) competing

17  businesses."  Id. at ¶ 57.  It was at this dinner meeting, according to plaintiffs, that Netflix

18  and Walmart "embarked upon a scheme" that would result in an unlawful market allocation

19  agreement.  Id.

20       On May 19, 2005, defendants issued a joint press release that purportedly revealed

21  the existence of the market allocation agreement between the parties.  Consolidated

22  Complaint, ¶ 59.  Plaintiffs allege that, via this market allocation agreement, defendants

23  unlawfully divided and allocated the markets for DVD sales and rentals, in order to create a

24  two-firm online DVD rental market.  Id.  Specifically, and beginning on May 19, 2005,

25  Walmart.com exited the online DVD rental market, while adding a prominently placed

26  Netflix link on Walmart's website encouraging customers to transfer their online DVD rental

27  subscriptions to Netflix – in exchange for Netflix's agreement "not to compete for new DVD

28

2

United States District Court

For the Northern District of California

1    retail sales." See id. at ¶¶ 61, 63.

2        As a result of the Agreement, plaintiffs allege that the online DVD rental market was

3    reduced to two competitors, and the downward pricing pressure from Walmart.com was

4    eliminated. See id. at ¶ 62. Plaintiffs further allege that absent the Agreement, Netflix

5    would have lowered its prices no later than May 19, 2005. Id. As a result of the

6    Agreement, however, Netflix was able to hold its subscription rate steady at the rate of

7    $17.99 per month, and its only remaining competitor – Blockbuster – was able to raise its

8    subscription price to match that of Netflix. Id. Blockbuster purportedly did so in July 2005,

9    raising its subscription price from $14.99 per month to $17.99 per month. As a

10   consequence, plaintiffs allege that millions of Blockbuster online subscribers paid unlawful

11   supracompetitive prices, and plaintiffs seek damages accordingly.

12       To that end, plaintiffs assert four causes of action against both Netflix and Wal-Mart:

13   (1) a claim for unlawful market allocation of the online DVD rental market, pursuant to

14   section 1 of the Sherman Act; (2) a claim for monopolization of the online DVD rental

15   market pursuant to section 2 of the Sherman Act; (3)  a claim for attempted monopolization

16   of the online DVD rental market pursuant to section 2 of the Sherman Act; and (4) a claim

17   for conspiracy to monopolize the online DVD rental market pursuant to section 2 of the

18   Sherman Act. See Complaint, ¶¶ 87-107. These claims – which are asserted against

19   Netflix and Wal-Mart on the basis of subscription fees paid by plaintiffs to non-defendant

20   Blockbuster – are commonly referred to as "umbrella liability" claims.

21       Defendants now move to dismiss plaintiffs' consolidated complaint in its entirety, on

22   grounds that the plaintiffs lack standing.

23                                    **DISCUSSION**

24   A.    Legal Standard

25       "A Rule 12(b)(6) motion tests the legal sufficiency of a claim.  A claim may be

26   dismissed only 'if it appears beyond doubt that the plaintiff can prove no set of facts in

27   support of his claim which would entitle him to relief.' "  Navarro v. Block, 250 F.3d 729, 732

28

3

United States District Court

For the Northern District of California

1   (9th Cir. 2001).  Dismissal pursuant to Rule 12(b)(6) is appropriate where there is no

2   cognizable legal theory or there is an absence of sufficient facts alleged to support a

3   cognizable legal theory.  Id.  The issue is not whether a plaintiff is likely to succeed on the

4   merits but rather whether the claimant is entitled to proceed beyond the threshold in

5   attempting to establish his or her claims.  De La Cruz v. Tormey, 582 F.2d 45, 48 (9th Cir.

6   1978).

7        In evaluating a motion to dismiss, all allegations of material fact are taken as true

8   and construed in the light most favorable to the nonmoving party.  See, e.g., Burgert v.

9   Lokelani Bernice Pauahi Bishop Trust, 200 F.3d 661, 663 (9th Cir. 2000)(citations omitted).

10   In order to survive a dismissal motion, however, a plaintiff must allege facts that are

11   enough to raise his/her right to relief "above the speculative level."  See Bell Atlantic Corp.

12   v. Twombly, 550 U.S. 544, 553-56 (2007).  While the complaint "does not need detailed

13   factual allegations," it is nonetheless "a plaintiff's obligation to provide the 'grounds' of his

14   'entitlement to relief' [which] requires more than labels and conclusions, and a formulaic

15   recitation of the elements of a cause of action will not do."  Id.  A plaintiff must allege

16   "enough facts to state a claim to relief that is plausible on its face," not just conceivable.

17   Twombly, 550 U.S. at 570.; see also Ashcroft v. Iqbal, __U.S. __, 129 S. Ct. 1937, 1950

18   (2009).

19        "A claim has facial plausibility when the plaintiff pleads factual content that allows the

20   court to draw the reasonable inference that the defendant is liable for the misconduct

21   alleged."  Iqbal, 129 S. Ct. at 1949 (citing Twombly, 550 U.S. at 556).  "The plausibility

22   standard is not akin to a probability requirement, but it asks for more than a sheer

23   possibility that a defendant has acted unlawfully."  Id.  "Where a complaint pleads facts that

24   are merely consistent with a defendant's liability, it stops short of the line between

25   possibility and plausibility of 'entitlement to relief."  Id.

26   B.   The Motion to Dismiss

27        The overriding question to be answered by the court is simple:  whether plaintiffs,

28

4

United States District Court
For the Northern District of California

1    who proceed against defendants Netflix and Wal-Mart based upon artificially inflated prices

2    that plaintiffs purportedly paid to *non-defendant Blockbuster*, have antitrust standing.  It is a

3    well-established maxim that plaintiffs in private antitrust suits seeking monetary damages

4    are required to possess "antitrust standing" before they are permitted to recover.  Antitrust

5    standing requirements in turn demand that a plaintiff prove he or she has been (1) "injured

6    in his business or property; (2) "by reason of anything forbidden in the antitrust laws...".

7    See 15 U.S.C. § 15(a).  To satisfy these elements, a plaintiff must show not only injury in

8    fact, but also that the injury received was "injury of the type the antitrust laws were intended

9    to prevent."  In other words, in order to have standing here, plaintiffs must connect any

10   alleged injury to the purposes of the antitrust laws.  See Atl. Richfield Co. v. USA

11   Petroleum, 495 U.S. 328, 334 (1990).

12           As this court has recognized on prior unrelated occasions, the general framework for

13   analyzing the existence of antitrust standing in a particular case is well-established.  The

14   framework is that which was first announced by the Supreme Court in Assoc. Gen.

15   Contractors of Cal. v. Cal. State Council of Carpenters, 459 U.S. 519 (1983)("AGC"), and

16   subsequently embraced by the Ninth Circuit.  See, e.g., Am. Ad Mgmt., Inc. v. Gen. Tel.

17   Co., 190 F.3d 1051, 1054-55 (9th Cir. 1999)(announcing Ninth Circuit's commitment to the

18   AGC factors vis-a-vis antitrust standing).  The AGC test, as it is known, sets forth multiple

19   factors to be considered in assessing standing, including:  (1) the nature of the plaintiff's

20   injury; (2) the directness of the injury; (3) the speculative nature of the harm; (4) the risk of

21   duplicative recovery; and (5) the complexity in apportioning damages.  See AGC, 459 U.S.

22   at 535; Am. Ad Mgmt., 190 F.3d at 1054-55.

23           Here, defendants' challenge to plaintiffs' antitrust standing is premised on a broader

24   challenge to the "umbrella liability" theory upon which plaintiffs' claims are based.

25   Defendants argue, first, that there is in essence a categorical bar to umbrella liability claims

26   that precludes plaintiffs from having standing as a matter of law.  Second, defendants

27   contend that even in the absence of any categorical bar, plaintiffs' complaint nonetheless

28

5

**United States District Court**

For the Northern District of California

1   fails to satisfy standing requirements under AGC, since the nature of the claims alleged is

2   far too remote.  To this, plaintiffs respond that not only is the legal precedent supporting the

3   existence of a categorical bar to standing for umbrella liability plaintiffs lacking, but this

4   case does not even require that the court decide as much.  Rather, adherence to AGC

5   limits the court's inquiry to the plaintiffs at bar and the specific facts alleged here, which

6   facts are more than sufficient to allege a direct link between plaintiffs' injury and

7   defendants' purportedly anticompetitive conduct, and to defeat defendants' motion.

8        As a preliminary matter, it is initially difficult to tell from defendants' moving papers

9   whether defendants argue the existence of a per se categorical exclusion that transcends

10  the AGC framework, or rather that umbrella liability cannot as a matter of law be recognized

11  under the AGC test, although defense counsel clarified at the hearing on the instant

12  motions that it is the latter argument upon which defendants rely.  Regardless which

13  characterization of the argument defendants choose, however, they cannot ultimately

14  prevail on either here.  In the first instance, the court is not persuaded that there is a

15  categorical bar precluding the umbrella liability theory in cases such as this.  As both

16  parties concede, the only controlling Ninth Circuit authority on this issue (which predates

17  AGC) disallowed umbrella liability claims to go forward in the context of a multi-tiered

18  distribution system, but expressly left open the question of umbrella liability in the single-tier

19  distribution context.  In re Petroleum Prods. Antitrust Litig., 691 F.2d 1335, 1340 (9th Cir.

20  1982)(reserving judgment as to whether, "in a situation involving a single level of

21  distribution, a single class of direct purchasers from non-conspiring competitors of the

22  defendants can assert claims for damages against price-fixing defendants under an

23  umbrella theory").  This is precisely the context that plaintiffs allege here.  Thus, there is no

24  controlling authority that affirmatively answers the question in the single-tier distribution

25  context, let alone authority that answers it by way of a per se exclusionary rule.

26        Second, to the extent that defendants concede that the AGC framework governs

27  but nonetheless urge the court to conclude that, as a matter of law, umbrella liability

28

United States District Court

For the Northern District of California

1  plaintiffs can *never* adequately allege the requisite <u>AGC</u> factors, the court declines

2  defendants' invitation to so hold.  Not only have the parties cited to competing circuit and

3  district court authorities, many of which come to different conclusions regarding the

4  availability of umbrella liability plaintiffs' standing, but the Supreme Court has more

5  importantly previously noted that antitrust standing is to be determined based upon a case

6  by case analysis of the facts, in light of <u>AGC</u>.  <u>See, e.g., Mid-West Paper Products Co. v.</u>

7  <u>Continental Group, Inc.</u>, 596 F.2d 573 (3d Cir. 1979)(rejecting umbrella liability claims);

8  <u>Antoine L. Garabet M.D., Inc. v. Autonomous Techs. Corp.</u>, 116 F. Supp. 2d 1159, 1167-69

9  (C.D. Cal. 2000)(rejecting antitrust standing for umbrella liability claims); <u>cf. In re Lower</u>

10  <u>Lake Erie Iron Ore Antitrust Litig.</u>, 998 F.2d 1144 (3d Cir. 1993)(allowing claims

11  characterized as umbrella liability claims to go forward); <u>see also AGC</u>, 459 U.S. at 537 n.

12  33 ("courts should analyze each situation in light of the [<u>AGC</u>] factors set forth").  It is just

13  such a case by case analysis that the court must accordingly engage in here.

14      In other words, the court must decide whether the facts, as set forth in plaintiffs'

15  complaint, adequately allege antitrust standing in light of the multiple factors set forth under

16  <u>AGC</u>.

17      On balance, the court concludes that the facts alleged are insufficient.  While the

18  court might find that – for the reasons advanced by plaintiffs' counsel – plaintiffs' complaint

19  adequately alleges an antitrust injury, and furthermore that there is no risk of duplicative

20  recovery here (such as that which results from the classic indirect purchaser scenario), it is

21  the remaining three <u>AGC</u> factors that ultimately tip the scale against a finding that antitrust

22  standing has been adequately alleged.  The three remaining factors are:  (a) the directness

23  of plaintiffs' injury; (b) the speculative nature of the harm; and (c) the complexity of

24  apportioning damages.

25      By far, the most significant of these is the directness of plaintiffs' injury.  This factor

26  looks to whether plaintiffs' alleged injury was the direct result of defendants' alleged

27  anticompetitive conduct.  To assess the directness of plaintiffs' injury, the court must look

28

7

**United States District Court**

For the Northern District of California

"to the chain of causation between [plaintiffs'] injury and the alleged restraint in the [alleged] market." See American Ad. Mgmt., 190 F.3d at 1058; AGC, 459 U.S. at 540. Here, this requires the court to determine the directness of the link in the causation chain between defendants' alleged market allocation agreement, and the artificially high online DVD subscription prices that Blockbuster charged to plaintiffs.

Plaintiffs allege, among other things, that:

• Blockbuster entered the DVD online rental market in August 2004 with a $19.99 3-out subscription rental price, at which time Netflix and Wal-Mart were already in the market;

• On October 14, 2004, Netflix responded to Blockbuster's entry in the market by dropping the price for its 3-out subscription plan from $21.99 to $17.99, in order to beat Blockbuster's price;

• On the following day, Blockbuster lowered its 3-out subscription price from $19.99 to $17.49 and approximately two weeks later,[1] Wal-Mart lowered its 3-out subscription price from $18.76 per month, to $17.36;

• Several weeks later, on December 22, 2004, Blockbuster once again lowered its 3-out subscription price, from $17.49 to $14.99;

• In January 2005, the two CEOs of Netflix and Wal-Mart met for dinner, at the invitation of Netflix CEO Reed Hastings;

• On April 21, 2005, Mr. Hastings stated that the key issue in the market place "is the number of major competitors," surmised that "[i]f there are only two major players, Blockbuster and Netflix, the profitability may be substantial," and predicted "the likely case" that "online rental becomes a two-firm market over the coming years;"

---

[1]     Plaintiffs' recitation of factual allegations, both in the consolidated complaint and as set forth at the hearing, state that Wal-Mart lowered the price of its 3-out subscription plan on November 1, 2005. However, it appears from the context and the stated time frames of the surrounding dates, that this date was inadvertently listed incorrectly, and that the correct date being alleged by plaintiffs is actually November 1, 2004. See, e.g., Complaint, ¶ 51.

United States District Court

For the Northern District of California

- On May 18, 2005, Blockbuster announced it was testing a higher $17.99 price for its online rental service;

- On May 19, 2005, Netflix and Wal-Mart issue a joint press release announcing a "joint promotional agreement," pursuant to which Walmart.com agreed to discontinue its online DVD rentals service and to promote and refer its existing customers to Netflix, and Netflix in return agreed to promote Walmart.com's online movie sales business;

- Within hours of Netflix and Wal-Mart's press release, Blockbuster announces a promotional offer meant to lure former Wal-Mart and current Netflix subscribers to Blockbuster's service;

- By June 19, 2005, Wal-Mart wound down its online rental service and closed operations; and

- On August 9, 2005, Blockbuster announced that it would be raising its 3-out subscription price from $14.99 to $17.99 per month, stating that the lower price was "not sustainable"

See Complaint, ¶¶ 46-48, 51-52, 56-57, 59, 70; see also Declaration of Sara Ciarelli Walsh ISO Def. Mot. Dismiss ("Walsh Decl."), Ex. 1 at 5-6; Ex. 6.[2]

Plaintiffs correctly suggest that, from these facts, the court can reasonably infer the existence of active competition in a three firm market for online DVD rentals, beginning with Blockbuster's entry into the market during late 2004 and continuing through the early 2005

---

[2] These facts are taken from plaintiffs' complaint, as well as certain press releases and articles submitted as exhibits in support of defendants' Walsh Declaration. Those press releases and articles are in large part the originating source of several of the quotations and references included in plaintiffs' complaint. Thus, to the extent that plaintiffs object to the introduction of facts based on these exhibits on grounds that they are outside the scope of this Rule 12(b)(6) motion, the objection is overruled. For as defendants correctly respond, the Supreme Court has explicitly authorized this practice in antitrust cases. See Twombly, 550 U.S. at 569 n. 13 ("the District Court was entitled to take notice of the full contents of the published articles referenced in the complaint, from which the truncated quotations were drawn"). Plaintiffs have, at any rate, conceded the introduction of these facts, as they expressly included the above-referenced facts in their time line of factual allegations submitted at the hearing on the instant matter.

9

United States District Court
For the Northern District of California

1   time period.  The allegations further highlight the fact that prior to Netflix and Wal-Mart's

2   announcement of the so-called "promotional agreement" between the two firms, Netflix's

3   CEO, Mr. Hastings, specifically noted the increased profitability that could derive from what

4   would "likely" become a two-firm market, and that, after the promotional agreement was

5   announced, Wal-Mart did in fact leave the market for online DVD rentals, thereby

6   transforming the three firm market into a two firm market.  Finally, the allegations

7   demonstrate that approximately two months after Wal-Mart's final exit from the market,

8   Blockbuster announced a price increase, from $14.99 to $17.99 per month – the same

9   price that Netflix was charging.

10        Critically, however, the allegations do not suggest, let alone establish, that

11  Blockbuster's price increase in August 2005 was directly attributable to any unlawful

12  agreement or conduct undertaken by Netflix or Wal-Mart specifically.  Indeed, as

13  defendants' argument notes – even if not fully developed – plaintiffs do not even allege that

14  Netflix increased its *own* 3-out subscription price in conjunction with or in response to the

15  allegedly unlawful market allocation agreement.  According to the complaint, plaintiffs

16  suffered injury via the supracompetitive subscription fees they paid to Blockbuster

17  beginning August 2005, as Blockbuster raised its subscription price to match the artifically

18  high $17.99 price purportedly maintained by Netflix.  See Complaint, ¶¶ 62, 68.  The

19  complaint also alleges, however, that Netflix originally dropped the subscription price of its

20  3-out plan from $21.99 per month to $17.99 in October 2004 as part of its response to

21  Blockbuster's entry into the market – i.e., well *before* Netflix is alleged to have "embarked

22  upon [its] scheme that would result in the" market allocation agreement – and never raised

23  it thereafter.  See Complaint, ¶¶ 47, 57.  Since the purportedly supracompetitive $17.99

24  subscription fee was allegedly set prior to the unlawful market allocation agreement, it thus

25  strains credulity, without more, to infer that Netflix unlawfully raised its price to $17.99 or

26  maintained it in response to the anticompetitive conduct alleged by plaintiffs or, by

27  extension, that Blockbuster's own price increase to match Netflix's $17.99 price in August

28

10

United States District Court
For the Northern District of California

1    2005 was itself an anticompetitive price hike in response to the unlawful agreement.

2    Moreover, in view of the remaining deficiencies in plaintiffs' causation theory (described in

3    further detail below), plaintiffs' alternative allegation that Netflix's maintenance of the

4    $17.99 price only became supracompetitive *after* the May 19 agreement – because the

5    agreement allowed Netflix to maintain that price when market conditions would normally

6    have caused Netflix to drop its price – is overly tenuous, and fails to demonstrate a

7    sufficient causal link between the purportedly unlawful agreement and the setting or

8    payment of a supracompetitive price by and to Blockbuster.

9        Even putting aside the issue of Netflix's supracompetitive pricing and its link to

10   Blockbuster's pricing, however, a more critical deficiency remains: that is, that far from

11   raising the inference that Blockbuster's raised price resulted directly from the purportedly

12   unlawful market allocation agreement, the allegations suggest that Blockbuster raised its

13   price independently, and unilaterally.  As plaintiffs concede, for example, Blockbuster

14   announced its testing of a $17.99 subscription price on May 18, 2005 – one day *prior* to the

15   announcement of the purported market allocation agreement.  See Walsh Decl., Exs. 7-8.

16   While plaintiffs correctly note that mere consideration of a price change may be

17   unremarkable, the fact that Blockbuster tested a higher subscription rental price prior to the

18   public announcement of the purportedly illegal agreement, and ultimately ended up

19   charging the exact same price several months after the announcement, does suggest that

20   the higher price was just as plausibly the material result of Blockbuster's independent

21   earlier testing and pricing decisions, and not the allegedly unlawful agreement or

22   defendants' conduct.

23       Furthermore, plaintiffs also concede that Blockbuster did not actually raise its price

24   until August 9, 2005 – almost three months after the defendants jointly announced the

25   existence of their agreement, and nearly two months after plaintiffs allege that Wal-Mart

26   finally exited the market place.  This time lag between the agreement and/or Wal-Mart's exit

27   from the market place, and Blockbuster's actual raising of its subscription price, is too great

28

United States District Court

For the Northern District of California

1   to suggest a direct causal link between the agreement and Blockbuster's higher price.  This

2   is particularly the case where, as noted above, Blockbuster's higher price might just as

3   plausibly be rooted in its own prior testing decisions, as in the agreement itself.  The time

4   lag is additionally suspect, given the pattern established the previous year of Blockbuster

5   lowering its prices within a few days or weeks of Netflix and Wal-Mart's lowering of prices.

6        Finally, not only does the delay between defendants' unlawful agreement and

7   Blockbuster's eventual price hike cast doubt on the causal connection between the two, but

8   Blockbuster's Chairman and Chief Executive John Antioco was quoted as saying that the

9   reason for the price increase, far from being tied to the unlawful elimination of a direct

10  competitor in the market, was that the lower $14.99 price was "not sustainable."  See, e.g.,

11  Walsh Decl., Ex. 4.

12       These allegations and facts undermine plaintiffs' reliance on paragraph 69 of the

13  complaint to establish a direct injury.  This paragraph alleges that Wal-Mart's exit from the

14  market place provided Blockbuster "with the opportunity and incentive to raise its price to

15  the artificially high levels set by reason of the elimination of Walmart DVD rentals from the

16  marketplace," and that Blockbuster followed up on this opportunity by raising its price to

17  match Netflix's price, which was priced 20% higher than Blockbuster's.  This allegation,

18  however, is far too conclusory and speculative to support plaintiffs' claim of a direct causal

19  link between defendants' conduct, and Blockbuster's ultimate pricing.  It contains no facts

20  that establish that the reason Blockbuster raised prices was *because of defendants'*

21  *conduct, or the agreement* itself.

22       In sum, the court is not persuaded that plaintiffs have plausibly alleged that, to the

23  extent they suffered injury via payment of artificially raised prices to Blockbuster, such

24  injury was proximately caused by defendants' actions in entering into the allegedly unlawful

25  marketing agreement.  Without such allegations, plaintiffs cannot establish that their injury

26  is sufficiently 'direct' to pass muster under AGC.  Their injury is simply too remote.

27       The remaining AGC factors at issue here – the speculative nature of plaintiffs' harm,

28

and the complexity of apportioning damages – also tilt decidedly against standing, in view of the foregoing analysis.  In sum, in view of the lack of a direct causal connection between plaintiffs' alleged injury and defendants' alleged conduct, plaintiffs' injury is unduly speculative, and damages would, as a result, be difficult to apportion.

All of which collectively leads the court to conclude that, in this case, the balance of AGC factors counsels against a finding of antitrust standing.  As such, defendants' motion to dismiss plaintiffs' claims, premised on subscription rates paid to third party Blockbuster, is GRANTED.

Federal Rule of Civil Procedure 15(a) provides that leave to amend a pleading "shall be freely given when justice so requires."  Fed. R. Civ. Proc. 15(a).  Leave to amend will be denied, however, where the amendment would be futile, or where the amended complaint would be subject to dismissal.  See Saul v. U.S., 928 F.2d 829, 843 (9th Cir. 1991); Reddy v. Litton Indus., Inc., 912 F.2d 291, 296 (9th Cir. 1990).  Plaintiffs have not expressly sought leave to amend here, and the court can think of no allegations, in light of those already in the complaint, that would alter the court's legal analysis and result.  Accordingly, since there is no set of additional facts that would cure the deficiencies noted above with respect to plaintiffs' allegations, the court finds that amendment would be futile.

C.     Conclusion

For the foregoing reasons, the court hereby GRANTS defendants' motion to dismiss. Plaintiffs' claims for relief are accordingly dismissed with prejudice.

**IT IS SO ORDERED.**

Dated: December 1, 2009

_____
PHYLLIS J. HAMILTON
United States District Judge

13