United States District Court
For the Northern District of California

1
2
3                    UNITED STATES DISTRICT COURT
4                    NORTHERN DISTRICT OF CALIFORNIA
5
6
7  IN RE: ONLINE DVD RENTAL
   ANTITRUST LITIGATION                    No. M 09-2029 PJH
8  _____/
                                           **ORDER GRANTING MOTION**
9  This Document Relates to:               **FOR SUMMARY JUDGMENT**
10
   Pierson v. Walmart.com USA LLC, et al.
11 (C 09-2163 PJH)
   Levy, et al. v. Walmart.com USA LLC, et al.
12 (C 09-2296 PJH)
   _____/
13
14        Defendant's motion for summary judgment came on for hearing on April 20, 2011
15 before this court.  Plaintiffs, individuals representing a putative class comprised of
16 subscribers to the online DVD rental service of Blockbuster, Inc. ("Blockbuster"), appeared
17 through their class counsel, Joseph Tabacco, Michael McLellan, Cadio Zirpoli, and
18 Matthew Ruan.  Moving party Netflix, Inc. ("Netflix") appeared through its counsel, Jonathan
19 M. Jacobson.  Defendants Walmart.com USA LLC ("Walmart.com") and Wal-Mart Stores,
20 Inc. ("Wal-Mart Stores")(collectively "Wal-Mart") appeared through their counsel, Stephen
21 Morrissey, though they did not join in this motion.  Having read all the papers submitted and
22 carefully considered the relevant legal authority, the court hereby GRANTS defendant's
23 motion for summary judgment, as follows.
24                              **BACKGROUND**
25        The present actions are part of a larger multidistrict litigation ("MDL") in which
26 plaintiffs assert claims against defendants Netflix and Wal-Mart for violation of the federal
27 antitrust laws.  These cases differ from the remaining MDL cases in that they have been
28 filed on behalf of a class of plaintiffs who purchased online DVD rental subscriptions from

United States District Court
For the Northern District of California

1   non-party Blockbuster.

2        The Blockbuster plaintiffs ("plaintiffs") generally allege that defendants Netflix and

3   Wal-Mart improperly entered into a marketing/promotion agreement (the "Agreement" or

4   "promotion agreement") on May 19, 2005, which had the effect of illegally dividing the

5   markets for sales and online rentals of DVDs in the United States.  See generally Second

6   Amended Complaint ("SAC").  The purpose of the Agreement, allege plaintiffs, was to

7   monopolize and unreasonably restrain trade in the market for online DVD rentals.  As a

8   result of the Agreement, plaintiffs generally claim that defendant Wal-Mart exited the

9   market and that Netflix was able to entrench and enhance its dominant market position in

10  the online DVD rental market, and ultimately, raise its price, with the result that Blockbuster

11  – now operating in a reduced two-firm market after the Agreement – was able to charge

12  higher subscription prices for online DVD rental programs.  As a result, millions of

13  Blockbuster online subscribers paid supracompetitive prices.

14       By pursuing claims against defendants based on allegedly anticompetitive prices

15  paid to a non-conspirator party, plaintiffs seek to assert what are generally known as

16  "umbrella liability" claims against defendants.

17  A.    Procedural History

18       In July 2009, defendants moved to dismiss plaintiffs' original first amended complaint

19  in its entirety, on grounds that the plaintiffs lack antitrust standing.  On December 1, 2009,

20  the court granted defendants' motion and dismissed the complaint with prejudice.

21       The court's order held that allegations of the first amended complaint supported the

22  following reasonable inferences:  the existence of active competition in a three-firm market

23  for online DVD rentals, beginning with Blockbuster's entry into the market during late 2004

24  and continuing through the early 2005 time period; that prior to Netflix and Wal-Mart's

25  announcement of the so-called "promotional agreement" between the two firms, Netflix's

26  CEO, Mr. Hastings, specifically noted the increased profitability that could derive from what

27  would "likely" become a two-firm market, and that, after the promotional agreement was

28

2

1   announced, Wal-Mart did in fact leave the market for online DVD rentals, thereby

2   transforming the three-firm market into a two-firm market; and that approximately two

3   months after Wal-Mart's final exit from the market, in August 2005, Blockbuster announced

4   a price increase, from $14.99 to $17.99 per month – the same price that Netflix was

5   charging.  See Order Granting Mot. to Dismiss ("Dismiss Order") at 9-10.

6         The court held, however, that these allegations could not establish that Blockbuster's

7   price increase in August 2005 was directly attributable to any unlawful agreement or

8   conduct undertaken by Netflix or Wal-Mart.  To demonstrate this point, the court highlighted

9   the following facts:  plaintiffs failed to allege that Netflix increased its *own* 3-out subscription

10  price in conjunction with or in response to the allegedly unlawful market allocation

11  agreement; plaintiffs alleged that Netflix originally dropped the subscription price of its 3-out

12  plan from $21.99 per month to $17.99 in October 2004 as part of its response to

13  Blockbuster's entry into the market – i.e., well *before* Netflix is alleged to have "embarked

14  upon [its] scheme that would result in the" market allocation agreement – and never raised

15  it thereafter, making it impossible to infer that Netflix unlawfully raised its price to $17.99 or

16  maintained it in response to the anticompetitive conduct alleged by plaintiffs or that

17  Blockbuster's own price increase to match Netflix's $17.99 price in August 2005 was itself

18  an anticompetitive price hike in response to the unlawful agreement; that plaintiffs'

19  allegations suggested that Blockbuster raised its price independently, and unilaterally,

20  given Blockbuster executive's statement that its $14.99 was "not sustainable" and given

21  that it began testing a $17.99 price in advance of the unlawful agreement's announcement;

22  and that the three month time lag between Wal-Mart's exit from the marketplace and

23  Blockbuster's August 2005 price increase was too long to suggest a direct link.  See

24  Dismiss Order at 10-12.

25        Thus, the court concluded that plaintiffs had failed to satisfy three AGC factors –

26  directness of the injury, speculative nature of the harm, and complexity in apportioning

27  damages – and that antitrust standing was accordingly lacking.

28

3

1    On December 16, 2009, plaintiffs requested leave to seek reconsideration of the

2    court's ruling granting dismissal, but only as to the dismissal with prejudice and denial of

3    leave to amend.  Plaintiffs argued that, in view of additional facts learned through

4    discovery, they could now allege a sufficiently direct link and causation theory between the

5    conspiratorial conduct alleged to have been engaged in by Netflix and Wal-Mart, and

6    Blockbuster's price increase.  According to plaintiffs, this new theory would no longer

7    depend upon Wal-Mart's exit from the market but rather on the direct link between

8    defendants' anticompetitive conduct and Blockbuster's eventual price increase (although

9    plaintiffs nonetheless additionally submitted that new allegations demonstrate that

10   Blockbuster's pricing decision *was* a direct response to Wal-Mart's exit from the market).

11   The court granted plaintiffs' request for leave to seek reconsideration as well as

12   reconsideration itself, and allowed plaintiffs to file a second amended complaint setting

13   forth their new allegations.  In so ruling, the court also noted, however, that plaintiffs "would

14   be well-advised to pay particular attention to the legal viability of their new causation

15   theory," and were "further reminded of the need to set forth allegations that demonstrate

16   the directness of plaintiffs' injury with the level of particularity required under the standards

17   previously noted and relied on by this court."  See Order Granting Reconsideration at 3.

18   Plaintiffs duly filed their second amended complaint ("SAC") on March 30, 2010.

19   Defendants thereafter filed a motion to dismiss the SAC, again arguing that plaintiffs lacked

20   antitrust standing.  On July 6, 2010, the court issued an order denying the motion to

21   dismiss.

22   The court's order noted that plaintiffs' newly revised theory of causation and injury

23   generally consisted of a two-part argument: first, that Netflix's anticompetitive conduct

24   consisted of its decision to pursue anticompetitive conduct and engage in artificial price

25   maintenance instead of competing in the relevant market, which would inevitably have led

26   to a price decrease; and second, that Blockbuster's prices were tied to Netflix's prices, and

27   would have consequently been lower in the fall of 2005 in the absence of defendants'

28

4

United States District Court

For the Northern District of California

1    anticompetitive conduct and agreement.  See Order Denying Motion to Dismiss SAC ("SAC

2    Dismiss Order"), at 4-5.  The court also noted the numerous "new" allegations that plaintiffs

3    had included in the SAC, the collective impression of which was to suggest a point by point

4    rebuttal to the material standing deficiencies highlighted by the court in its previous order

5    granting the first motion to dismiss.

6         The court found that plaintiffs' revised theory of causal injury was distinct from that

7    previously advanced, in that it now focused on Netflix's ability to convert a competitive price

8    into a supracompetitive price by *refusing* to compete in an unrestrained market, as well as

9    Blockbuster's "reliance" on Netflix pricing in setting its own pricing.  See SAC Dismiss

10   Order at 7.  In determining whether the revised theory satisfied the three standing

11   requirements previously found lacking – i.e., directness of the injury, speculative nature of

12   the harm, and complexity in apportioning damages – the court noted, however, that it

13   continued to be troubled by plaintiffs' ability to allege a sufficiently direct theory.  It was not

14   immediately apparent, for example, even assuming that Netflix intentionally failed to lower

15   its price and engaged in artificial price maintenance, that plaintiffs had sufficiently alleged

16   that Blockbuster's prices were tied to Netflix's and would have been lower in fall 2005 in the

17   absence of any anticompetitive conduct.  Id. at 8.

18        This observation stemmed from the fact that plaintiffs continued to rest upon the

19   fundamental premise that defendants' anticompetitive conduct led to higher prices for

20   Netflix subscribers, which in turn led to higher prices for Blockbuster subscribers.  By

21   definition, however, this type of injury is normally indirect.  Id.  And in the absence of any

22   allegations explaining the precise nature of the purported interconnectedness between

23   Blockbuster and Netflix pricing, plaintiffs' allegations tended to suggest the unilateral

24   exercise of Blockbuster's business judgment in voluntarily deciding to track Netflix's pricing,

25   rather than any pricing decisions resulting from defendants' unlawful conduct.  Id. at 8-9.

26        Nonetheless, although uneasy with plaintiffs' revised theory and its ability to satisfy

27   the 'directness' standard set forth in AGC, the court permitted plaintiffs to proceed past the

28

5

United States District Court

For the Northern District of California

1   pleading stage, and denied defendants' motion to dismiss.  The court was motivated to do

2   so by the fact that there was, as usual, no case law directly on point with the present

3   factual scenario, and the fact that an evidentiary record in the action would permit plaintiffs

4   to flesh out the allegations currently pled, such that a more direct causal link between

5   defendants' conduct and plaintiffs' injury might be stated.  Id. at 10.  Discovery could, for

6   example, prove the precise nature of Blockbuster's pricing in relation to Netflix's, or

7   demonstrate that Blockbuster was aware of the unlawful market agreement well prior to the

8   agreement's public announcement, such that the court could perhaps conclude that

9   defendants' price maintenance was the direct cause of Blockbuster's eventual price hike,

10  and that plaintiffs were also within the realm of injured parties to which defendants should

11  be held accountable.  See SAC Dismiss Order at 10-11.

12       The court granted defendants leave, however, to file an early summary judgment

13  motion limited to antitrust standing, "should discovery result in an evidentiary record which

14  would enable the court to answer some of the questions" raised in its order.

15  B.   The Instant Motion

16       Accepting the invitation offered by the court in the order denying the motion to

17  dismiss the SAC, and fact discovery now having been completed, defendant Netflix now

18  seeks early summary judgment with respect to antitrust standing.  In short, defendant

19  seeks a ruling that the Blockbuster plaintiffs lack antitrust standing to proceed with their

20  claims as a matter of law, based on the undisputed evidence in the record.

21                            **DISCUSSION**

22  A.   Legal Standard

23       Summary judgment is appropriate when there is no genuine issue as to material

24  facts and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56.

25  Material facts are those that might affect the outcome of the case.  Anderson v. Liberty

26  Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute as to a material fact is "genuine" if there

27  is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party.  Id.

28

United States District Court
For the Northern District of California

1    A party seeking summary judgment bears the initial burden of informing the court of

2    the basis for its motion, and of identifying those portions of the pleadings and discovery

3    responses that demonstrate the absence of a genuine issue of material fact.  Celotex Corp.

4    v. Catrett, 477 U.S. 317, 323 (1986).  Where the moving party will have the burden of proof

5    at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other

6    than for the moving party.  Southern Calif. Gas. Co. v. City of Santa Ana, 336 F.3d 885,

7    888 (9th Cir. 2003).  On an issue where the nonmoving party will bear the burden of proof

8    at trial, the moving party can prevail merely by pointing out to the district court that there is

9    an absence of evidence to support the nonmoving party's case.  Celotex, 477 U.S. at 324-

10   25.  If the moving party meets its initial burden, the opposing party must then set forth

11   specific facts showing that there is some genuine issue for trial in order to defeat the

12   motion.  See Fed. R. Civ. P. 56(e); Anderson, 477 U.S. at 250.

13   As plaintiff duly notes, "[i]n antitrust cases, these general standards are applied even

14   more stringently and summary judgments granted more sparingly."  Beltz Travel Serv., Inc.

15   v. Int'l Air Transp. Ass'n, 620 F.2d 1360, 1364 (9th Cir.1980)(citations omitted).

16   Nonetheless, entry of summary judgment remains proper "where the moving party has

17   shown that there is no genuine issue of material fact or where, viewing the evidence and

18   the inferences that can be drawn therefrom in the light most favorable to the opposing

19   party, the moving party clearly is entitled to prevail as a matter of law."  See Fed. R. Civ. P.

20   56(a); Vaughn v. Teledyne, Inc., 628 F.2d 1214, 1220 (9th Cir. 1980); see also Program

21   Eng'g, Inc. v. Triangle Publ'ns, Inc., 634 F.2d 1188, 1192 (9th Cir. 1980).

22   B.    Legal Analysis

23   The instant motion does not draw upon a blank slate, but rather builds on all

24   previous motions filed in this action, and requires the court to definitively answer – with the

25   advantage of a full evidentiary record now before it – the following narrow issue:  whether

26   plaintiffs have adequately alleged antitrust standing pursuant to the factors enunciated in

27   Assoc. Gen. Contractors of Cal. v. Cal. State Council of Carpenters ("AGC"), with particular

28

7

United States District Court

For the Northern District of California

1  reference to the most critical of the AGC factors at issue in this litigation:  directness of the

2  injury.  See AGC, 459 U.S. 519 (1983).[1]

3      In order to determine whether plaintiffs' injury is sufficiently direct to satisfy standing

4  requirements, it is helpful, preliminarily, to outline the contours of plaintiffs' theory of

5  antitrust injury.  Having now had the benefit of discovery, and as defendant notes, plaintiffs

6  no longer advance the theory that Blockbuster's August 2005 price increase was a direct

7  response to (i.e., directly caused by) Wal-Mart's exit from the market.  See Declaration of

8  Anthony Wiebell ISO MSJ ("Wiebell Decl."), Ex. 2.  Rather, plaintiffs assert antitrust

9  standing based on the following:  that in the but-for world (i.e., absent the allegedly

10  anticompetitive agreement), Netflix would have lowered its prices to a true competitive

11  level, and because Blockbuster pricing was derived in part from Netflix pricing,

12  Blockbuster's prices would have either matched or been lower than Netflix's.  In other

13  words, Blockbuster's August 2005 price increase would have been less, had Netflix

14  competed fairly in the market and lowered its own prices.  See id.; see also, e.g., Opp. Br.

15  at 12:15-18.[2]

16      Turning to the viability of this theory in establishing a 'direct' link between

17  defendants' alleged conduct and plaintiffs' injury – i.e., the material issue before the court

18  under AGC – plaintiffs essentially contend that, since defendant has conceded for purposes

19  of the motion that in the but-for world Netflix would have lowered its prices to $15.99, the

20  'only' issue before the court is whether Blockbuster "set its prices to keep at or below

_____

22  [1]      The five factor test for antitrust standing set forth in AGC and adopted by the
Ninth Circuit requires consideration of: (1) nature of the injury; (2) directness of the injury; (3)
23  speculative nature of the harm; (4) risk of duplicative recovery; and (5) complexity in
apportioning damages.  As the court's prior orders in this case have clarified, there are only
24  three truly material AGC factors that raise issues in this case: directness of the injury, the
speculative nature of the harm, and the complexity in apportioning damages.  Of these,
25  however, it is the 'directness of injury' factor that is the critical one – as noted previously
by the court – upon which the remaining two relevant factors will rise or fall.

26  [2]      For purposes of the instant motion, defendant has accepted for argument's sake
the premise that Netflix would, in fact, have lowered its prices in the but-for world, and would
27  further have lowered its price to $15.99 absent anticompetitive activity.  See Reply Br. ISO
MSJ at 5, n.3.

8

United States District Court

For the Northern District of California

Netflix" (i.e., whether Blockbuster's prices "tracked" or "matched" Netflix's prices).  See Opp. Br. at 5:7-9.  And in determining this price relationship, plaintiffs further assert that they only need prove and the court need only analyze whether Netflix's pricing "predictably would have impacted" Blockbuster's pricing.  Plaintiffs need not demonstrate that Blockbuster's pricing is "wholly derivative" of Netflix's pricing, nor must they demonstrate that defendants' anticompetitive conduct is the sole cause of plaintiffs' injuries; indeed, say plaintiffs, courts have found antitrust injury even in instances where the prices paid by plaintiffs were affected by factors other than the anticompetitive conduct.  In sum, plaintiffs contend that all that is required is that there be some direct relationship between Blockbuster's pricing and Netflix's pricing.

They also assert that such a 'direct relationship' has been demonstrated here. Plaintiffs rely on the following purportedly undisputed evidence:  that, according to Blockbuster, Netflix "defined the market price at maximum $19.99" as early as 2003; later on in the class period, Blockbuster modeled its variable profitability in the online DVD market by using Netflix's then prevailing $21.99 price as a baseline; Blockbuster's then CEO testified that Blockbuster would not have priced a comparable Blockbuster plan higher than "market leader" Netflix at this time; that Blockbuster's October 2004 price cut (to $17.49) was driven by and in response to Netflix's price cut (to $17.99); that Blockbuster's December 2004 price cut (to $14.99) was further intended to undercut Netflix; that Blockbuster's August 2005 price increase (to $17.99) was not implemented until after the unlawful agreement and Wal-Mart's exit from the market, and was meant to "mirror Netflix prices;" that, although Blockbuster had an in-store fulfillment goal that it had previously viewed as a precursor to any price increase, Blockbuster instituted its August 2005 price hike before actually reaching those in-store fulfillment goals; and that, throughout the remainder of the class period, Blockbuster's prices never exceeded Netflix pricing for a comparable product.  See Declaration of Richard M. Volin ISO MSJ Opp. ("Volin Decl."), Ex. 1 at 8; Ex. 3 at 0004425; Ex.2 at 13:1-5, 19:22-20:15, 118:3-6; Ex. 7; Ex. 15 at

1   00058632; Ex. 16 at BB00341235; Ex. 19 at BB00252832; Ex. 25 at 160:12-14.

2       According to plaintiffs, the foregoing undisputed facts demonstrate that Blockbuster's

3   August 2005 price increase was meant to "match" Netflix's price increase, and was also an

4   intended consequence of Netflix's business decisions and conduct.  They also indisputably

5   suggest that, if Netflix had lowered its prices in the but-for world to $15.99, Blockbuster

6   would have matched the $15.99 price or set a price lower than Netflix's "market price

7   maximum."

8       Defendant, predictably, takes issue with plaintiffs' argument and showing.

9   Defendant's objections are premised on both legal and factual grounds.  Legally, defendant

10  disputes plaintiffs' assertion that all that is needed to prove a sufficiently 'direct' injury is that

11  Netflix pricing was viewed by Blockbuster as a maximum 'constraint' on the market that

12  required Blockbuster to 'match' Netflix prices.  Rather, plaintiffs must demonstrate that

13  Netflix pricing is the actual *cause* of Blockbuster pricing, in a true economic sense.  This is

14  the only way for plaintiffs to demonstrate that their injuries were caused directly by

15  defendants' purportedly unlawful and anticompetitive conduct.  Else, the court risks

16  substituting mere 'correlation' of prices for 'causation' – which defendant asserts is the true

17  touchstone of the 'directness of injury' analysis.

18      From a factual perspective, moreover, defendant argues that the undisputed

19  evidence supports the conclusion that there is no direct causal link, in the true economic

20  sense, between Netflix pricing and Blockbuster pricing.  Defendant specifically relies on the

21  following:  that Blockbuster took numerous factors into account when making pricing

22  decisions, including Blockbuster's financial condition, costs, price testing and research,

23  product usage, etc; that Blockbuster lowered its prices to compete against Netflix pricing in

24  August and December 2004 because Blockbuster believed it had an "inferior service" at the

25  time, and Blockbuster wanted to "aggressively get market share;" that Blockbuster's then-

26  CEO knew that the $14.99 price set in December 2004 was "not sustainable," and was a

27  temporary price that would eventually need to be increased; that presentations to the Board

28

10

United States District Court
For the Northern District of California

1    of Directors in 2005 indicated that Blockbuster's price for a 3-out plan would be raised to

2    $17.99 whenever Blockbuster began integrating a program to allow customers to ship from

3    stores, and when Blockbuster in fact increased its price to $17.99 in August 2005,

4    Blockbuster had in fact activated nearly all of its stores in a ship from stores program; that

5    Blockbuster tested prices higher than $14.99 prior to the announcement of the Agreement

6    in question; that Blockbuster executives testified that the timing of the eventual August

7    2005 price increase was in part because of Blockbuster's financial condition, and the

8    possibility of defaulting on certain debt covenants worth more than $1.4 billion, in

9    conjunction with better service levels; and that Blockbuster's pricing at times diverged not

10   only among its own subscriber base (dependent upon whether a subscriber was a "light" or

11   "heavy" user), but also diverged from Netflix pricing, as pricing throughout the post-2005

12   class period demonstrates.  See Wiebell Decl., Ex. 9 at 98:12-101:5, 102:10-104:11; Ex.

13   17; Ex. 21 at 86:1-22, 109:2-22, 113-14; Ex. 1 at 363, 376, 429-31; Ex. 26; Ex. 12 at 300:6-

14   20.  All of these facts, say defendant, demonstrate that any price "match" that occurred in

15   August 2005 was not a sufficiently 'direct' product of any anticompetitive conduct by

16   defendant, nor was it a product of any true economically driven market 'constraint' or

17   mechanism that tied Blockbuster pricing to Netflix pricing.  Instead, Blockbuster pricing –

18   though it may have correlated with Netflix pricing – was the product of Blockbuster's

19   unilateral business decisions.

20        On balance, now having reviewed the evidentiary record submitted by the parties,

21   the court agrees with defendant.  First, and beginning with the legal parameters of the

22   present inquiry, defendant is correct that in demonstrating that AGC's 'directness of the

23   injury' factor has been satisfied, plaintiffs' burden is to demonstrate that their alleged injury

24   – i.e., here, the price paid to Blockbuster – was ultimately the direct result of Netflix and

25   Wal-Mart's alleged anticompetitive conduct.  To assess the directness of plaintiffs' injury,

26   the court must look "to the chain of causation between" the prices paid by Blockbuster

27   plaintiffs, and prices set by Netflix as a result of defendants' unlawful conduct.  See

28

American Ad. Mgmt., 190 F.3d at 1058; Assoc. Gen. Contractors, 459 U.S. at 540.  And as defendant points out, plaintiffs' theory of a causal link – i.e., that Netflix pricing, by virtue of Netflix's status as the dominant player in the online DVD rental market, constituted a "maximum" ceiling that dictated Blockbuster's pricing – is simply too attenuated to be considered sufficiently direct.

As noted on earlier occasions, there is no case law in an analogous scenario that is directly on point.  Plaintiffs do place great reliance on Amarel v. Connell, 102 F.3d 1494 (9th Cir. 1996), and Loeb Indus., Inc. v. Sumitomo Corp., 306 F.3d 469 (7th Cir. 2002).  However, examination of these cases only serves to highlight the insufficiently direct nature of plaintiffs' claimed injury.

In Amarel, the Ninth Circuit considered the antitrust standing question vis-a-vis California rice farmer plaintiffs who participated in the un-milled rice market, but alleged in part that other cooperatives of rice farmers had engaged in predatory pricing in the milled rice market, which unlawful activity had the effect of depressing prices in the un-milled rice market in which plaintiffs sold their goods.  The court there found a sufficiently direct injury to have been suffered by plaintiffs for purposes of antitrust standing, because the milled rice and un-milled rice markets were interdependent, "close[ly] tie[d]," and defendants' predatory pricing in the market for milled rice "predictably would have impacted" the price of unmilled rice.  See 102 F.3d at 1512.  Notably, however, the Ninth Circuit also found significant the fact that "plaintiffs' profits were, in part, a function of profits in the milled rice market," since plaintiffs directly participated in the milled rice market by virtue of certain contracts that plaintiffs had with the mills to which they sold rice, which contracts gave plaintiffs a share of the profits from the sale of milled rice.  See id.

Similarly, in Loeb, the Seventh Circuit turned its attention to the copper market, and to the claims of plaintiff purchasers in the copper cash market (e.g., purchases of copper cathode, copper rod, and scrap copper) against defendant copper manufacturers, merchants, and brokers.  Plaintiffs alleged that defendants conspired to artificially inflate

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

1    the price of copper futures, which in turn inflated the price of copper in the cash market.

2    See 306 F.3d at 474.  The Seventh Circuit allowed certain claims brought by purchasers of

3    copper cathode and rod to go forward, and ruled that these purchasers had demonstrated

4    a sufficiently direct injury for purposes of antitrust standing.  As in Amarel, the Loeb court

5    noted that the prices for copper in the futures market were directly linked to the price of

6    physical copper in the cash market, including cathode, rod and scrap copper, and that

7    dealers in all forms of physical copper routinely quoted prices based on "rigid formulas

8    related to copper cathode futures."  See id. at 476.  To that end, prices for copper in the

9    cash markets were "directly based" on prices paid in the futures market, and prices in both

10   markets (e.g., prices of cathode and cathode futures) tended to move "in lockstep."  Id. at

11   488.  On balance, the court found this relationship to be sufficient to establish a direct

12   relation between the defendants' allegedly anticompetitive scheme, and plaintiffs' injury.

13        From these cases, the court gleans two important characteristics that supported

14   affirmative findings of a sufficiently direct injury.  First, the fact that in both cases, the

15   markets involved commodities.  Second, the existence of interlinked and interdependent

16   commodities markets, the nature of which ensured that unlawful conduct and resulting

17   injury in one commodity market necessarily impacted resulting prices in a related

18   commodity market.

19        Applying these observations here, plaintiffs' attempt to assert a sufficiently direct

20   injury as a result of paying inflated prices to non-conspirator Blockbuster, based upon the

21   anticompetitive conduct and injuries occasioned by Netflix and Wal-Mart's alleged activities,

22   is premised on an overly vague connection between the two.  To begin with, the online

23   DVD rental market is not a commodities market.  Nor is there, as in the foregoing cases,

24   the allegation that unlawful conduct and resulting prices in one market has – by virtue of

25   characteristics inherent in the alleged markets – directly impacted pricing in a closely

26   related and interdependent market.  More fundamentally, plaintiffs here have failed to point

27   to any true independent market 'constraint' or 'mechanism' that, as a matter of economic

28

United States District Court
For the Northern District of California

1   principle, would predictably dictate the setting of Blockbuster's prices, as a form or function

2   of Netflix's prices (such as the 'lockstep' relationship between cash and futures markets).

3   As such, application of the case law relied upon by plaintiffs suggests the conclusion that

4   plaintiffs have failed to demonstrate a sufficiently direct link between Netflix pricing as a

5   result of defendants' allegedly unlawful conduct, and Blockbuster's August 2005 decision to

6   raise prices.

7       The evidentiary record submitted by the parties only serves to reinforce the

8   foregoing.  Plaintiffs have not truly disputed, for example, that numerous independent

9   factors aside from the purportedly unlawful agreement in question or Wal-Mart's exit from

10  the market – including, for example, the temporary and unsustainable nature of the $14.99

11  price set by Blockbuster in late 2004 and the influence of Blockbuster's finances, debt

12  covenants, and service levels on Blockbuster's decision to eventually raise prices –

13  contributed to Blockbuster's pricing decisions, and by extension its decision to increase

14  prices in August 2005.  Furthermore, notwithstanding plaintiffs' position that Blockbuster's

15  price increase(s), when implemented, may very well have been aimed at 'meeting' or

16  beating Netflix pricing from a competitive standpoint, plaintiffs' evidence does not actually

17  establish that Blockbuster's decision to do so was in fact motivated by anything other than

18  wholly internal and/or executive recognition of Netflix pricing as the competitive benchmark

19  set in the marketplace.  Plaintiffs strive to equate Blockbuster's recognition of Netflix pricing

20  as the maximum ceiling price in the market, with an independent and direct causal

21  relationship between Netflix and Blockbuster pricing; but the court finds no support for such

22  a causal link, particularly in view of the foregoing evidence to the contrary.

23      In short, plaintiffs fail to demonstrate that Netflix pricing truly "set" or determined

24  Blockbuster pricing, as a function of any interdependent market interaction, as opposed to

25  simply a likely function of the competitive dynamics of the marketplace.  At best, and

26  viewing all facts in the light most favorable to plaintiffs, plaintiffs demonstrate only that

27  Blockbuster pricing was set with *reference* to Netflix pricing.  But there is nothing to indicate

28

United States District Court

For the Northern District of California

1   that Blockbuster pricing – or its price increase in August 2005 – was in any way directly

2   influenced or impacted by Netflix's alleged anticompetitive conduct, which is ultimately what

3   plaintiffs were asked to demonstrate.

4          In sum, nothing in the evidentiary record has convinced the court that a genuine

5   dispute of material *fact* is present, so much as a genuine dispute over the legal construction

6   that the facts presented should be given.  Plaintiffs highlight the particular facts in the

7   record they believe should be marshaled and interpreted to support the finding that a direct

8   causal link has been stated, while defendants mine the record for equally particularized

9   facts that support the contrary interpretation.  Ultimately, however, what both parties seek

10  is a judgment as a matter of law that their particular legal interpretation of what are

11  common facts is correct.  And for the foregoing reasons, the court agrees with defendant's

12  legal interpretation of the facts presented, finding that even construed in a light most

13  favorable to plaintiffs (both those relied upon by plaintiffs and those relied upon by

14  defendant and not disputed by plaintiffs), the facts do not sufficiently establish the existence

15  of a direct causal link between defendant's alleged conduct and resulting anticompetitive

16  price, and the Blockbuster subscription prices paid by plaintiffs beginning in August 2005.

17  Indeed, the full evidentiary record has only confirmed the legitimacy of the court's initial

18  concerns over plaintiffs' theory of injury – and specifically, its concern over plaintiffs ability

19  to demonstrate that they belong within the realm of injured parties to whom defendants

20  should justly be held responsible.  See Blue Shield of Virginia v. McCready, 457 U.S. 465,

21  477 (1982)(although an antitrust violation "may be expected to cause ripples of harm to

22  flow through the Nation's economy," there is nonetheless "a point beyond which the

23  wrongdoer should not be held liable").

24         Accordingly, defendant is entitled to prevail as a matter of law with respect to the

25  issue of plaintiffs' ability to satisfy the most 'critical' of antitrust standing requirements here

26  – directness of the injury.  And since the court has already found that the remaining AGC

27  factors are influenced by this critical factor, summary judgment as to antitrust standing is

28

**United States District Court**

For the Northern District of California

1   therefore appropriate.

2   C.      Conclusion

3          For the foregoing reasons, the court finds that plaintiffs have failed to demonstrate

4   antitrust standing, and the court hereby GRANTS defendant's motion for summary

5   judgment.

6   **IT IS SO ORDERED**.

7   Dated: April 29, 2011

8                                                         _____
                                                        PHYLLIS J. HAMILTON
9                                                       United States District Judge

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28